

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00324-CV

———————————————

LUCIA NAZARIAN, INDIVIDUALLY, AND AS PROPOSED ADMINISTRATOR OF THE ESTATE OF KEVORK NAZARIAN, Appellant

V.

REMARKABLE HEALTHCARE OF CARROLLTON, LP D/B/A REMARKABLE HEALTHCARE OF PRESTONWOOD, LBJM, LLC, AND REMARKABLE HEALTHCARE, LLC, Appellee

———————————————

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 21-4111-431

———————————————

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In the final year of his life, Decedent Kevork Nazarian lived in a long-term care facility owned or operated by Appellees Remarkable Healthcare of Carrollton, LP, LBJM, LLC, and Remarkable Healthcare, LLC (together, Remarkable). Decedent's wife, Appellant Lucia Nazarian, claims that Remarkable's lapses caused Decedent to suffer fall-related injuries that led to his death.

Nazarian sued Remarkable and timely served it with expert reports pursuant to the Medical Liability Act (MLA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). But Remarkable objected to the reports as inadequate.[1] Although the trial court provided Nazarian with an opportunity to cure by filing amended expert reports, the court ultimately held that the amended reports were inadequate, and it dismissed the case on that basis. *See id.* § 74.351(b), (c), (l).

Nazarian appeals, asserting that her amended expert reports were adequate under the MLA. Because we agree, we will reverse the trial court's judgment.

## I. Background

Decedent suffered from a form of dementia and had a documented history of falling. Nonetheless, when he moved into Remarkable's long-term care facility in March 2019, he was assessed to be at only a "moderate" risk for falls. In the months

---

[1]Under the MLA, if a claimant asserting a health care liability claim fails to serve the defendant with a timely, adequate expert report, then the defendant is entitled to a dismissal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (b).

that followed, Decedent suffered a series of injuries—some witnessed and some unwitnessed—which Nazarian attributes to falls.[2]

One such injury occurred at Remarkable's facility in May 2019. Decedent sustained bruising on his forehead and a fracture to his arm, and when he was taken to the hospital for treatment, the hospital staff noted that it was possible his injury had been caused by a fall. The day after he returned from the hospital to Remarkable, he was found on the floor of the dining room—another possible fall, according to Nazarian.

Decedent fell again in July and August, first falling from a chair at the nurse's station and hitting his face, then falling while trying to sit down in a chair in one of Remarkable's community rooms. And in September, he was found on the floor of his room—another unwitnessed, possible fall—and he was unable to get up without staff assistance. Again in early October, he was found on the floor of his room.

Later that month he fell again, this time while bending down to pick something up. A Remarkable staff member was present when the fall occurred, but she was not able to prevent or break it. Decedent hit his head during the fall and was taken to the hospital. He was diagnosed with a subdural hematoma and suffered a seizure.[3]

---

[2]Remarkable disputes that the unwitnessed injuries resulted from falls.

[3]Nazarian's experts indicated that, less than a month before Decedent's late October fall, a "CT scan of [his] head . . . [had been] unremarkable."

According to Nazarian, the subdural hematoma continued to increase in size, leading to a decline in Decedent's health and to his ultimate death in August 2020.

Nazarian—individually and as proposed administrator of Decedent's estate—filed negligence claims against Remarkable for causing Decedent's injuries and death. Nazarian timely served Remarkable with expert reports from Dr. Richard Dupee and Nurse Jennifer Kosar pursuant to the MLA. *See id.* § 74.351(a). But the trial court sustained Remarkable's objections to the adequacy of the expert reports, and it granted Nazarian an opportunity to cure.

When Nazarian served amended reports from the same two experts, Remarkable objected again and moved to dismiss. Remarkable argued that the amended reports "fail[ed] to articulate the manner in which [Remarkable] breached a specifically[ ]detailed standard of care for fall interventions within a nursing facility with a causal link between the alleged breach and [Decedent's] injuries here." The trial court sustained the objections and dismissed the case.

Nazarian appeals, challenging the trial court's determination that her expert reports were inadequate.[4]

---

[4]Nazarian lists only one issue presented: whether the trial court applied the correct standard when determining whether the expert reports were adequate. She argues that because the reports were adequate under the appropriate standard, the trial court's rejection of the reports as inadequate reflects its application of a heightened standard. In essence, then, Nazarian contends that the trial court erred by finding the reports to be inadequate.

## II. Governing Law and Standard of Review

Under the MLA, a claimant asserting a health care liability claim must serve each health care provider with a timely, adequate expert report early in the proceedings. *See id.*; *Baty v. Futrell*, 543 S.W.3d 689, 692–93 (Tex. 2018). If the report is (1) untimely or (2) inadequate,[5] then upon the defendant's motion, the trial court must dismiss the case. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b), (c), (l); *Baty*, 543 S.W.3d at 692–93; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001).

An expert report is inadequate if "it appears to the [trial] court, after hearing, that the report does not represent an objective good faith effort to comply with the [MLA's] definition of an expert report." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l); *Baty*, 543 S.W.3d at 693. The MLA's definition of an expert report requires "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). Whether an expert report constitutes a "fair summary of the expert's opinions" is

---

[5]If a report is inadequate, the trial court may grant a 30-day extension to cure the deficiency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). Such an extension was granted here.

determined based on the four corners of the report, taken as a whole. *E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022).

The report need not marshal all of the plaintiff's proof, nor rise to the level of summary judgment evidence, nor convince the reader that the expert's conclusions are reasonable. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223, 226 (Tex. 2018); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017); *Woodland Nursing Operations, LLC v. Vaughn*, No. 02-22-00169-CV, 2022 WL 17494603, at *4 (Tex. App.—Fort Worth Dec. 8, 2022, pet. filed) (mem. op.). But the report must provide enough information to "inform the defendant of the specific conduct the plaintiff has called into question" and "provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 878–79; *see Abshire*, 563 S.W.3d at 223; *Woodland Nursing Operations*, 2022 WL 17494603, at *4.

The trial court's decision to dismiss a case based on an inadequate expert report is reviewed for an abuse of discretion. *Baty*, 543 S.W.3d at 693; *Palacios*, 46 S.W.3d at 875, 877; *see E.D.*, 644 S.W.3d at 664.

## III. Discussion

Remarkable sought dismissal based on Nazarian's expert reports' allegedly inadequate summary of (1) Remarkable's breaching conduct and (2) causation. The trial court's judgment cannot be sustained on either basis.

## A. Breaching Conduct

Remarkable argues, as it did before the trial court, that Nazarian's reports did not identify the specific actions that the standard of care required but that Remarkable failed to take. It analogizes this case to *Palacios* and asserts that, because Remarkable did not have an absolute duty to prevent falls, Nazarian's experts could not rely on vague statements that Remarkable failed to take proper fall precautions. But these arguments are off base.

### 1. The reports gave a fair summary of the breaching conduct.

First, Nurse Kosar and Dr. Dupee opined that the standard of care required at least two specific things that Remarkable failed to provide: (1) a one-on-one staff attendant within arm's reach and (2) a soft helmet.

#### a. Nearby attendant

According to Nurse Kosar, "the standard of care compelled" that, "[w]ithin two weeks after [Decedent's] admission," Decedent's care plan should have "included the intervention of supervision for a 1:1 staff attendant within arm's reach to prevent or break a fall." Such care was necessary, Nurse Kosar explained, "to address [Decedent's] unsteady gait, bilateral extremity weakness, history of falls, psychotropic medication use, incontinence, wandering[,] and lack of safety awareness." According to Nurse Kosar's review of the records, Remarkable did not provide a staff attendant within arm's reach, and it had "a 'much below average' staffing rating" from the Centers for Medicare and Medicaid Services.

7

Dr. Dupee opined similarly. Like Nurse Kosar, he noted that the standard of care required "[p]rovid[ing] adequate and trained staff to meet the needs of the residents." Applying that standard to Decedent's situation, he opined that, "within two weeks of [Decedent's] admission," the standard of care required Remarkable to implement a care plan that included "[i]ncreas[ing] staffing to allow for 1:1 attendant supervision (within arm's reach)." He noted that Remarkable failed to take these actions and that the attendant present during Decedent's October 29, 2019 fall was "not in a position to prevent or break the fall."

### b. Soft helmet

In addition to the need for a nearby attendant, Nurse Kosar opined that, given Decedent's history of falls and his "tendency to wander," his care plan should have been updated to "include[] a soft helmet for [him] to wear"—particularly after a possible fall injured his arm in May 2019.[6] Dr. Dupee reiterated this opinion, stating that "within two weeks of [Decedent's] admission," the standard of care required

---

[6]In the trial court, Remarkable argued that providing a soft helmet required a doctor's order and that it did not have the duty to supply such a helmet without an order. But Nurse Kosar's and Dr. Dupee's reports state otherwise. They state that Remarkable had a duty, under the relevant standard of care, to include a soft helmet in Decedent's care plan.

Plus, Remarkable's argument puts the cart before the horse. "The only question here is whether [Nazarian's two] expert reports provided enough information for the trial court to conclude they constituted a good-faith effort." *Miller*, 536 S.W.3d at 517. "Whether each defendant [turns out to be] liable for [Decedent's] death is not the question at this stage; that will be answered further in the litigation process." *Id.*

8

Remarkable to implement a care plan that included "[p]rovision and application of a soft helmet to protect from head injury." Both experts concluded that Remarkable breached its duty of care by failing to include such a soft helmet as part of Decedent's care plan.

Remarkable does not explain why these two breaches—the failure to provide an attendant within arm's reach and a soft helmet—were insufficiently specific to "inform [it] of the specific conduct the plaintiff has called into question."[7] *Palacios*, 46 S.W.3d at 879.

### 2. *Palacios* is distinguishable.

Instead, Remarkable analogizes this case to *Palacios*. *See id.* at 879–80. But *Palacios* merely confirms the adequacy of Nazarian's expert reports.

In *Palacios*, the plaintiff's expert observed that the patient "had a habit of trying to undo his restraints and [that] precautions to prevent his fall were not properly utilized." *Id.* at 879–80. This "[wa]s not a statement of a standard of care," though, and the expert did not state what, if anything, the standard of care required the hospital to do to address this issue. *Id.* at 880. "Knowing only that the expert believe[d] that [the hospital] did not take precautions to prevent the fall might [have] be[en] useful if [the hospital] had an absolute duty to prevent falls from its hospital

---

[7]Remarkable discusses the nearby-attendant recommendation on causation grounds, but not on specificity. And it glosses over the soft-helmet recommendation altogether.

9

beds," but no such absolute duty existed, so the expert was required to specify whether "the standard of care required [the hospital] to have monitored [the patient] more closely, restrained him more securely, or done something else entirely." *Id.* Because the expert failed to do so, the report was inadequate. *Id.*

Nurse Kosar and Dr. Dupee did precisely what *Palacios* required. Rather than ambiguously opining that unidentified "precautions to prevent [Decedent's] fall were not properly utilized," *id.* at 879–80, Nurse Kosar and Dr. Dupee stated that the relevant standard of care required Remarkable to implement two specific fall-prevention measures—providing a nearby attendant and a soft helmet—and that Remarkable failed to implement those measures.

Because Nazarian's expert reports identified two particular breaches of a specific standard of care, the reports put Remarkable on notice of the conduct complained of and constituted a "fair summary of the expert[s'] opinions . . . regarding applicable standards of care[ and] the manner in which the care rendered by the . . . health care provider[s] failed to meet the standards." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The trial court abused its discretion to the extent that it concluded otherwise, and its dismissal judgment cannot be sustained on this basis.

## B. Causation

Remarkable also sought dismissal based on the alleged inadequacy of Nazarian's experts' opinions on causation. Remarkable described the expert reports

10

as speculative, conclusory, and "pure conjecture," arguing that they (1) were insufficiently specific as to how the proposed interventions would have actually prevented Decedent's injuries and (2) speculated regarding the cause of Decedent's unwitnessed injuries. Again, we disagree.

## 1. The reports gave a fair summary of causation.

Nurse Kosar and Dr. Dupee causally linked Remarkable's breaches—its failure to provide a one-on-one attendant within arm's reach and a soft helmet—to Decedent's May 2019 arm injury and his October 2019 head injury.

### a. Nearby attendant

Nurse Kosar opined that, "having a 1:1 staff attendant would have prevented [Decedent's] likely falls and unexplained injuries," including his May 2019 and October 2019 fall-related injuries. And Dr. Dupee explained that providing a nearby attendant "would have allowed the staff to prevent or break a fall or blunt force impact." Remarkable acknowledges these opinions but asserts that the experts "call[ed] for speculation that staff could have somehow broken the falls" without explaining how that could have occurred.

But it is not a leap to conclude that Decedent's falls could have been prevented or broken by an attendant who was "within arm's reach" and "in a position to prevent [Decedent] from falling or to break [his] fall"—as Nurse Kosar opined the standard of care required. The very parameters of the attendant's role explained how that

11

attendant could have intervened in the chain of causation.[8]  Although we may not fill gaps in the expert's opinion, we need not disregard logic. *Cf. Columbia N. Hills Hosp. Subsidiary, L.P. v. Gonzales*, No. 02-16-00433-CV, 2017 WL 2375770, at *4 (Tex. App.—Fort Worth June 1, 2017, no pet.) (mem. op.) (noting that "a causation opinion that contains an obvious gap in the chain of causation" is inadequate but that "a statement on causation [is] sufficient if the expert establishes a logical, complete chain that begins with a negligent act and ends in injury to the plaintiff").

Furthermore, a "causation opinion is not conclusory simply because it is not complex." *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No. 02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.). "[T]he detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim," *id.*, and here, the negligent act—failing to provide an attendant within arm's reach—was not complex at all.

Given the simplicity and self-explanatory nature of Remarkable's breaching conduct, Nazarian's expert reports adequately enunciated a chain of events that connected the breach—Remarkable's failure to provide a one-on-one attendant within arm's reach—to Decedent's injuries—his falling in May and October 2019 without

---

[8]To the extent that Remarkable disputes the reasonableness of requiring a staff attendant within arm's reach, "[a]t this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *Miller*, 536 S.W.3d at 516–17.

anyone in a position to break his falls, resulting in fall-related arm and head injuries. No further detail was required.

### b.    Soft helmet

Nurse Kosar and Dr. Dupee also provided a fair summary of how, in their opinions, Remarkable's failure to provide a soft helmet caused Decedent's October 2019 head injury.

Dr. Dupee opined that "[a] soft helmet would have prevented injury to [Decedent's] head regardless of how it was happening."[9]  Nurse Kosar agreed.  She acknowledged that "the soft helmet would not have prevented the fall" but explained that "it would have prevented the traumatic impact to his head."  Decedent's record did not show that he was provided a soft helmet, and when he fell in October 2019, Nurse Kosar noted that "[p]er medical records," the fall resulted in a subdural hematoma.  This subdural hematoma, Dr. Dupee explained, "brought about grand mal seizure activity leading to an exacerbated decline in overall health for [Decedent] . . . and ultimately his death."

---

[9]Throughout Dr. Dupee's discussion of causation, he referred to Decedent's head injury as having resulted from a fall on October 5, 2019.  But the witnessed fall that led to Decedent's diagnosis of a subdural hematoma occurred on October 29, 2019; a different fall occurred on October 5.  Remarkable pointed out this discrepancy to the trial court and Nazarian's counsel explained that he believed Dr. Dupee intended to refer to October 29 rather than October 5.  We cannot assume that Dr. Dupee meant something other than what he stated in his report.  Nonetheless, his discussion of Decedent's fall-related subdural hematoma and of what a soft helmet could have prevented speak to Nazarian's theory of causation.

13

The experts thus provided a logical chain of events that connected Remarkable's failure to provide a soft helmet to Decedent's traumatic head injury and ultimate demise.

### 2. Evidence-based inferences are not speculation.

But Remarkable alleged that the experts' reports contained other speculative components. In the trial court, it argued that the experts not only speculated regarding the causal links but also supported their causation opinions with speculative facts. Because many of Decedent's injuries—including his May 2019 arm injury—were unwitnessed, Remarkable reasoned that the experts could not have known if Decedent's injuries were caused by a fall and could only speculate about the cause of the injuries.[10]

We rejected this argument in *Woodland*. *See Woodland Nursing Operations*, 2022 WL 17494603, at *7–10. There, as here, the provider emphasized that the decedent's injury was of unknown origin, arguing that the expert could not know whether such injury was the result of a fall and whether it was proximately caused by the provider's alleged breaches. *Id.* at *7–8. But the expert detailed the facts he had relied upon—including the decedent's CT scans, the related clinical findings, and the photographs of the decedent's head—to conclude that the decedent's head injury was likely caused by a fall. *Id.* at *7, 9. He did not speculate how the injuries occurred; he inferred

---

[10]Although Remarkable does not expressly reassert this argument on appeal, it hints at it in its appellate brief, and Nazarian dedicates a portion of its brief to addressing it.

based on the evidence, and he addressed causation based on his inferences. *See id.* at *7–10. The expert's evidence-based inferences were thus permissible and did not render the report inadequate. *Id.* at *9.

The same is true here. The mere fact that Decedent's May 2019 injury was unwitnessed did not prevent Nazarian's experts from inferring what caused the injury or opining what could have prevented it. As in *Woodland*, the experts were permitted to make evidence-based inferences. *See id.* at *7–10; *cf. Regent Care Ctr. of Laredo, Ltd. P'ship v. Abrego*, No. 04-07-00320-CV, 2007 WL 3087211, at *5 (Tex. App.—San Antonio Oct. 24, 2007, pet. denied) (mem. op.) (rejecting argument that expert lacked factual basis for evidence-based inference that patient fell).

And as in *Woodland*, Nazarian's experts recited the evidence that led to their inference that Decedent's May 2019 arm injury was the result of a fall. Nurse Kosar and Dr. Dupee noted Decedent's history of falling; they considered his unsteady gait and other risk factors; and they reviewed the hospital staff's conclusion that the May 2019 arm injury was possibly the result of an unwitnessed fall. While Remarkable may have disagreed with the experts' inferences, "[w]hether an expert's factual inferences in the report are accurate is an issue for summary judgment, not a Chapter 74 motion to dismiss." *Woodland Nursing Operations*, 2022 WL 17494603, at *9 (quoting *Pinnacle Health Facilities XV, LP v. Chase*, No. 01-18-00979-CV, 2020 WL 3821077, at *12 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.)); *Pinnacle Health Facilities*,

15

2020 WL 3821077, at *12 (rejecting argument that expert "improperly inferred that [decedent's] bedrails were not in place on the night of his fall").

The expert reports enunciated a chain of events that connected Remarkable's breaches—its failure to provide a nearby attendant and a soft helmet—to Decedent's injuries—his May 2019 arm injury and October 2019 head injury—so the reports adequately "provide[d] a fair summary of the expert's opinions . . . regarding . . . the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The trial court abused its discretion to the extent that it concluded otherwise; its dismissal judgment cannot be sustained on this basis.

## III. Conclusion

Because Nurse Kosar's and Dr. Dupee's reports provided a fair summary of the applicable standard of care, what specific conduct failed to meet this standard, and the causal relationship between the failures and the injuries alleged, *see id.* § 74.351(l), (r)(6), the trial court abused its discretion by rejecting the reports as inadequate and dismissing Nazarian's case.

Accordingly, we reverse the trial court's judgment of dismissal and remand the case for further proceedings consistent with this opinion. Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: May 11, 2023